## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Carson Smith and Eva Smith, | ) | C/A No.: 3:19-2155-JMC-SVH |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Brian "Jay" Koon, Lexington | ) | REPORT AND |
| County Sheriff in his official | ) | RECOMMENDATION AND |
| capacity; Sheriff's Department of | ) | ORDER |
| Lexington County; Thomas J. | ) | |
| Bonnette, Jr., Lexington County | ) | |
| Deputy; Sgt. Miles Rawl; John | ) | |
| Does 1 through 5, individually and | ) | |
| in her/their official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Carson Smith ("Carson") and Eva Smith ("Eva") (collectively, "Plaintiffs") originally filed this matter in the Court of Common Pleas for Lexington County, South Carolina, asserting claims based on violations of their constitutional rights and violations of state law concerning Carson's allegedly unlawful arrest on October 13, 2017. [ECF No. 1-1]. Defendants Brian Jay Koon ("Koon,) the Sheriff's Department of Lexington County ("Sheriff's Department"), Thomas J. Bonnette, Jr. ("Bonnette"), Miles Rawl ("Rawl"), and John Does (collectively "Defendants") removed the action to this court on August 1, 2019. [ECF No. 1].

This matter is before the court on Defendants' motion for summary

judgment. [ECF No. 13]. The motion having been fully briefed [ECF Nos. 14, 15, 16], it is ripe for disposition. Also before the court is Defendants' motion to strike the surreply brief [ECF No. 17] and Plaintiffs' unopposed motion to amend/correct their response to Defendants' motion for summary judgment. [ECF No. 18, *see also* ECF No. 19].

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(f) (D.S.C.). Because the summary judgment motion is dispositive, this report and recommendation is entered for review by the district judge. For the following reasons, the undersigned denies Defendants' motion to strike, grants Plaintiff's motion to amend, and recommends granting in part and denying in part Defendants' motion for summary judgment.

I.    Factual Background

A.    Plaintiffs' Version of the Facts

The main event leading to Carson's arrest took place on October 6, 2017, at a convenience store called the Gator Mart, located near where Carson attended River Bluff High School ("RBHS") and adjacent to the home of Christopher Raines ("Raines") also known as A.J. Blues. [*See* ECF No. 14-1 ¶¶ 5, 7, 12].[1]

---

[1] It is undisputed that Raines resided with his mother and stepfather on several acres adjacent to the Gator Mart [ECF No. 14-18], and that he had

Carson and Raines and their respective families were known to each other prior to the event in question. On August 25, 2017, Carson was at the Gator Mart and reports the following:

> I saw A.J. Blues near the Gator Mart with a cross bow in his hand because of how he looked. I recall that he drove up toward the store but he was still on his property, near a driveway under a tree on the grass. I assumed this was his property. He also had a big stick for a while. There were about four to six students with me at this time. I did not say anything to A.J. Blues (Raines). He was honking his horn, revving the engine, and shouting at us.

*Id.* ¶ 7.

Thereafter, Carson alleges that another vehicle approached him driven by an older woman and an older man, who Carson later discovery was Raines's mother and stepfather, Marie and Dan Corley. *Id.* ¶ 8. The woman filmed the encounter with her phone, and the man threatened Carson and those standing with him and seemed to want to hit Carson, although Carson's older brother, Christopher Grant Smith ("Grant"), prevented that from happening. *Id.* Carson attests that "[t]he man got back into his car and drove back onto the next door property and that is when we saw him with a gun. I called 911." *Id.*

---

issued, prior to the incident in question, multiple social media warnings, complaints, video threats, and stated threats to RBHS students. [ECF No. 14-11 (incident and arrest warrant for unlawful communication by threatening RBHS students from August to September 2017), ECF 14-12 (selected media posts by Raines in part threatening RBHS students), ECF No. 14-28 (August 2017 video with Raines threatening RBHS students), *see also* ECF No. 13-1 at 17 n.9 ("Christopher Raines was arrested for 'Threatening life, person or family of public employee' and 'Unlawful Communication' in March of 2018")].

Carson states the police arrived quickly, and both he and his brother explained to a police officer what happened. [ECF No. 14-1 ¶ 9, *see also* ECF No. 13-13 at 22 (August 25, 2017 police report)].[2]

Carson alleges that although he had heard of Raines, partially due to Raines having previously posted a video threatening Carson's family, Carson had not physically interacted with Raines other than the above and on the day in question, October 6, 2017. [ECF No. 14-1 ¶¶ 5–12, ECF No. 14-23 at 12:23–13:8, *see also* ECF No. 14-19 (September 2017 video of Raines filming Grant at the Gator Mart, stating "sooner or later one of them is going to get shot")].[3]

On the day in question, Carson and Grant pulled into the Gator Mart, driving a Ford Explorer and Ford F-150, respectively. [ECF No. 14-1 ¶ 12, ECF No. 14-15 ¶ 2].[4] Carson attests as follows:

---

[2] Dan Corley was arrested for this incident and Eva and Grant were present at his bond hearing on September 3, 2017, when Raines followed Eva and Grant out of the courthouse, recording them, necessitating the intervention of security to allow Eva and Grant to exit the parking lot without Raines recording their tag number. [ECF No. 13-13 at 25 (September 3, 2017 police report)].

[3] Carson further attests that he may have seen Raines in early September 2017, because a car that looked like the car Carson had seen Raines driving pulled up near Carson's home at about 2 or 3 a.m. [ECF No. 14-1 ¶ 11]. However, there was no physical interaction between Carson and Raines at that time.

[4] Carson, who turned 17 in August 2017, attests that he never drove the Ford F-150 during the relevant time period and had only started driving the Ford Explorer a few months prior to the incident in question. [ECF No. 14-1 ¶¶ 2–4, *see also, e.g.*, ECF No. 14-26 ¶ 2].

> I did see A.J. Blues, or it looked like him coming toward the Gator
> Mart. I do not know if he got on the property of the Gator Mart or
> he was still on his property. It was pretty clear he had a crossbow
> with him it appeared it was pointed in our direction to my
> recollection. I never got out of my car while at the Gator Mart and
> I left about just minutes later to go [to the] Waffle House. I then,
> while driving on the street, saw A.J. Blues come toward the car
> fast – he was running or walking fast. He yelled (it was loud)
> something at me, it was hard to hear at the time in the car, it
> sounded like stop or something like that. I could not really hear it
> and I slowed and asked "what." I saw A.J. Blues pointing the cross
> bow at the car then and I just drove away. I did not rev the engine.

*Id.* ¶ 12.

Carson then proceed to the Waffle House but received a call from Grant to return to the Gator Mart to speak with a police officer about the incident that had just occurred. *Id.* ¶ 13. Carson drove back and provided a statement. *Id.* Carson's parents, Eva and Chris Smith ("Chris"), as well as Grant (collectively, "the Smith family") were present. *Id.* Carson attests that he "did not call the police ever that night but I understood later my brother did call them that night either when I was leaving or afterward." *Id.*

According to Grant, a short time after the above incident occurred between Raines and Carson and apparently after Carson had departed the Gator Mart, Grant called his parents, and they arrived at the Gator Mart. [ECF No. 14-15 ¶ 3]. At the direction of Eva, Grant called the Sheriff's Department and "told the dispatcher a general summary of what happened" ("dispatch

call"). [ECF No. 14-15 ¶ 3, ECF No. 14-2 ¶ 15]. The audio of the dispatch call

reveals that Grant stated to the dispatcher, in part, as follows:

> There is a man who is running in the middle of the road with a
> crossbow threatening people that drive by . . . . I prefer not to say
> my name since he's kinda like after me . . . . My name is Carson
> Smith . . . . He has a white shirt on . . . a fedora . . . he's white . . .
> . I'm pretty sure it is that A.J. Blues guy.

[ECF No. 13-11]. Grant attests as follows concerning the dispatch call:

> I did see this man (AJ Blues-Mr. Raines) yelling as he was running
> or walking fast towards my brother. Although it was dark out, Mr.
> Raines did have a crossbow with him and it appears to be directed
> toward us at some points which felt threatening. He did flash the
> crossbow at me as I rode by. I assumed he was probably was doing
> that to other people on the road near the Gator Mart and we just
> wanted the police to come and check it out because this man had
> been arrested for threatening to kill students a few weeks before
> this night. I never said he was running thru the Gator Mart
> parking lot with a crossbow to anyone. I realize now (after listening
> to the call for the first time) that the dispatcher said that and I did
> not correct her. I just gave her a description of the person. My Mom
> said it was okay to give the dispatcher my name and to tell her
> about what happened to Carson as well. In the confusion of
> listening to my mom talking and the dispatcher talking, I said my
> name was Carson instead of saying he was the victim (the one Mr.
> Raines was yelling at and advancing towards), which is what I
> intended to convey.

[ECF No. 14-15 ¶ 3].[5]

Following the incident, Grant recalls the officer asking Grant if he had

"revved [his] engine when [he] rode past Mr. Raines' house earlier that

---

[5] It appears undisputed that the phone number provided by the caller and the
number used to make the dispatch call was Grant's number, not Carson's. [*See*
ECF No. 14-3 at 98:8–99:8, 107:8–109:3; ECF No. 14-15 ¶ 3; ECF No. 13-11].

evening." *Id.* ¶ 7. Grant responded that he had "gave it the gas," but also that he did that to "get out of the way of the strong spotlight that Mr. Raines was shining on [him] as [he] drove down Mill Stream," not to harass Raines. *Id.*

Grant attests that someone from the police department called him the next day, but he was at a football game and could not hear the officer well. *Id.* ¶ 4. The officer provided Grant a phone number, and Grant reported the call and number to Eva. *Id.*

Eva attests Grant informed her that Rawl contacted Grant and that she tried to contact Rawl and others at the police department multiple times that week unsuccessfully. [ECF No. 14-2 ¶ 16, *see also* ECF No. 13-3 at 17:3–7]. Eva attests she left multiple messages at the police department, but never received a response. [ECF No. 14-2 ¶ 16].[6] On October 13, 2017, Rawl's supervisor contacted Eva and informed her that arrests warrants were out for Carson and Grant. *Id.* ¶ 17. Eva informed her sons, who turned themselves in. [ECF No. 14-1 ¶ 16, ECF No. 14-23 at 23:4–8]. Carson spent one night in jail and was

---

[6] Rawl stated in his deposition that he communicated with Eva at some point, although he was unsure when, and she informed either him or Bonnette "that they would not come in, that they had an attorney." [ECF No. 13-3 at 17:14–19:24]. Eva denies ever informing Rawl that her sons had a lawyer prior to their arrest "because [she] had no idea that Sheriffs' Department was even contemplating arresting them [] until [she] was notified of their warrants on October 13, 2017." [ECF No. 14-2 ¶ 16].

given an ankle bracelet to track his movements. [ECF No. 14-23 at 28:5–29-12].

Thereafter Bill LaLima, Esq. ("LaLima"), was retained to represent Carson, and Bradley Kirkland, Esq. ("Kirkland"), was retained to represent Grant. [ECF No. 13-5 at 62:16–19, 64:17–20, *see also* ECF No. 14-27].[7] Eventually the charge was dismissed against Carson on July 13, 2018. [ECF No. 13-18].

B.    Defendants' Version of the Facts

On October 6, 2017, there was a report of a civil disturbance among Raines, Grant, and Carson, and both Raines and a caller identifying himself as Carson called in to report the incident. [ECF No. 13-8 ¶ 3, *see also* ECF No. 13-2, ECF No. 13-11, ECF No. 14-13].[8] The police call report ("call report") concerning the dispatch call from the caller identifying himself as Carson states as follows: "Carson Smith – ADV WM w/ white shirt and fedora hat

---

[7] Defendants object to the affidavit of LaLima, "as he was not identified by Plaintiffs as a witness in their responses to defendants' interrogatories." [ECF No. 15 at 2 (citing ECF No. 14-27)]. Because the court does not rely on LaLima's affidavit in resolving the parties' motions, it is unnecessary to address this argument.

[8] Raines's call to the dispatcher is submitted to the court both as an audio file and can be heard on the video evidence also submitted to the court. [ECF No. 13-13-2, ECF No. 14-13]. In this call, Raines reports the movements of Grant and Carson as both exit the Gator Mart and as Grant returns to the Gator Mart, stating "both Smith kids" have been "harassing us all night." *See id.*

chasing people through the gas station plot with a cross bow – ADV he believes male is AJ Blues." [ECF No. 13-10 at 3].

Additionally, the incident report ("incident report") created by officer J.J. Bice ("Bice") on the night in question states he was informed by dispatch that a "subject with a white T-shirt was running after people with a cross bow at the Gator Mart," and, after Bice arrived on the scene, Carson and Grant provided statements. [ECF No. 13-9 at 4]. Bice states in the incident report that Grant's statement contained inconsistencies in that "he originally stated that the subject was pointing the crossbow from the corner of the Gator Mart building," but then stated "Raines was on his property during the entirety of the incident." *Id.* Bice additionally reports that Raines informed him "that the two boys were revving their engines and yelling at him while driving past his residence" and that he had video surveillance so showing. *Id.*

The written statement provided by Carson that night states as follows:

> Me and my brother were at the Gator Mart at this time and we see AJ Blues walk to the property line (maybe closer), with his crossbow pointed at us. I left first and when I was going down the road I see AJ sprinting to the road yelling threats like "stop" and "come here," all while carrying his crossbow. I slowed down and yelled "what." I saw him pointing his crossbow at me when he was probably 15 feet away. When I saw his cross bow I kept on driving away.

[ECF No. 13-12 at 2].

The following day, October 7, 2017, Bonnette was assigned to this case for follow up. [ECF No. 13-8 ¶ 8]. Bonnette and her supervisor Rawl went to Raines's residence to speak with him and his family about the incident that occurred the night before, and Raines and his family explained to Bonnette and Rawl the history between his family and the Smith family. [ECF No. 13-8 ¶ 8, ECF No. 13-9 at 7, *see also* ECF No. 18-1 at 32:13]. As attested by Bonnette, "[t]here were several documented reports from the Lexington County Sheriff's Department and the Town of Lexington Police Department of negative interactions occurring between Raines and members of the Smith family," and "[t]he vast majority of these negative interactions involved two vehicles, a red Ford Explorer bearing SC tag number 'KYP203' and a 1986 Ford F150 pickup truck bearing SC tag number 'MKF336,'" vehicles owned by Eva and driven by either Carson or Grant. [ECF No. 13-8 ¶ 8 (citing ECF No. 13-13)].

During this meeting, Raines provided videos to Bonnette from the incident, which Bonnette attests "clearly showed that Raines never left his property and never pointed a crossbow at anyone." [*See* ECF No. 13-8 ¶ 9, *see also* ECF No. 14-13 (18-minute video including events that occurred on the date in question and 911 call made by Raines), ECF No. 14-17 (41-minute video

10

containing post-911 call period and interview that night with law enforcement with Raines and his family)].[9]

Rawl attempted to set up a meeting with Carson, Grant, and Eva, but no meeting occurred. [ECF No. 13-8 ¶ 10]. Bonnette attests that he was never called by anyone in the Smith family to set up a meeting, and he is not aware of anyone contacting Rawl either. *Id.*[10]

Based on the evidence gathered at this point, Bonnette believed it was appropriate to charge both Carson and Grant with first degree harassment of Raines. Bonnette attests his evidence included the following:

> [T]he 911 call report showing that Carson Smith had called and reported that Raines was chasing people through the Gator Mart

---

[9] Plaintiffs, not Defendants, have submitted this video evidence. There is dispute if this evidence provided by Plaintiffs and shown to Bonnette in his deposition is the exact same evidence provided by Raines to Bonnette and referenced by Bonnette in his affidavit to secure the arrest warrant against Carson, with Bonnette testifying he did not review all the evidence as he investigated Carson. [*See* ECF No. 13-8 ¶ 9, ECF No. 14-3 at 141:10–24, *see also* ECF No. 15 at 6 ("As attested by Defendant Bonnette, he did review two videos during the course of his investigation and recognized portions of the two videos shown to him at his deposition, but could not say if they were the exact same videos."]. Notwithstanding, Bonnette attests both the video evidence before the court and what he consulted in his investigation did not "show[] Raines pointing a crossbow at anybody or show[] Raines leaving his property." [ECF No. 13-8 ¶ 20, *see also* ECF No. 14-4, ECF No. 15 at 7]. Additionally, Defendants have informed the court that Carson "had his arrest records expunged and it appears that the two videos reviewed by Defendant Bonnette during the course of his investigation were destroyed," but that the videos submitted to the court by Plaintiffs are not being "disclaime[d]" by Defendants and are "clearly relevant." [ECF No. 17 at 3–4].

[10] As stated above, Rawl does not recall when he spoke with Eva. [*See* ECF No. 13-3 at 17:14–19:24].

with a crossbow; Carson Smith later recanting that statement and stating that he observed Raines walk close to the property line; that Carson Smith in his 911 call and statement asserted on numerous occasions that Raines had pointed a crossbow at him and the video evidence showed that Raines never pointed a crossbow at anyone that evening; the video evidence also revealed that Raines never left his property that event; and, the long history of Raines making complaints of harassment regarding the two vehicles owned by Eva Smith and being driven by either [Grant] and Carson Smith revving their engines and yelling expletives at both Raines and his family on numerous occasions.

[ECF No. 13-8 ¶ 14, *see also* ECF No. 13-1 at 3–4].

On October 13, 2017, Bonnette completed a request for an arrest warrant. [ECF No. 13-14 (arrest warrant request)]. Bonnette swore two almost identical affidavits for both Carson and Grant for the alleged harassment of Raines, stating as follows:

On 10/6/2017 at approximately 10:00 pm the defendant Carson Smith did commit Harassment on the victim Christopher Raines when he called 911 and advised dispatchers that the vict[em] was "chasing people around in the roadway while aiming a crossbow at them." The def recanted his statement to law enforcement after they arrived on scene and said "the vict never left his property during the incident". The video also shows the vict yelling to the def "leave us alone, you have no reason to be here". The affiant was provided video evidence showing that the vict never pointed a crossbow at anyone. Furthermore the affiant is in possession of incident reports from Lexington County Sheriff's Department as well as Lexington Police Department dating back to May 2017 involving the def and /or the red Explorer or the 1986 Ford F150 pickup truck registered to the def mother [E]va Smith. These reports show the def engaged in numerous verbal altercations with the vict. These incidents took place in the Lexington County.

[ECF No. 14-4, *see also* ECF No. 14-21 at 2 (affidavit concerning Grant)]. Later that day, Bonnette presented his evidence to Magistrate Judge Arthur L. Myers, who determined that probable cause existed to arrest both Grant and Carson. [*See* ECF No. 13-15]. As stated above, both Carson and Grant turned themselves in and were detained at the Lexington County Detention Center that evening. [ECF No. 13-9 at 11].

Assistant Solicitor Lester McGill Bell, Jr. ("Bell"), was assigned to prosecute the case. [ECF No. 13-17 ¶ 4].[11] Ultimately, Bell dismissed the charge against Carson Smith on July 13, 2018, because there was insufficient evidence to prosecute. [ECF No. 13-18]. While Bell believed there was overwhelming evidence supporting a finding of probable cause for the arrest of Carson Smith, he also believed the burden in proving beyond a reasonable doubt at trial would be difficult and that Raines "would likely have been an impeachable witness and possibly disliked by the jury." [ECF No. 13-17 ¶¶ 5– 6].[12] Following the dismissal of the charge, Carson Smith successfully moved to have all the records related to his arrest expunged. [ECF No. 13-16].

---

[11] Plaintiffs have submitted evidence that in March and April 2018 Eva submitted to Rawl the two videos, with her commentary, which also have been submitted to the court. [ECF No. 14-16]. Because the court does not rely on this commentary or other commentary provided by Plaintiffs concerning audio and video files submitted to the court, the court need not address Defendants' objections to these exhibits. [*See* ECF No. 15 at 2–3 (citing ECF No. 14-16, ECF No. 14-2 at 7)].

[12] Defendants have submitted evidence that as of December 1, 2017, both

II.     Discussion

A.     Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in

---

LaLima and Kirkland also believed probable cause existed for the arrest of Carson. [ECF No. 13-5 at 127:7–11, 137:22–138:4, ECF No. 13-6, ECF No. 13-7].

favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

### B.    Analysis

Plaintiffs alleged Bonnette and Rawl violated their Fourth, Eighth, and Fourteenth Amendment rights due to Carson's unlawful seizure and for malicious prosecution. Plaintiffs further assert the following state law causes of action all Defendants: (1) false imprisonment, (2) malicious prosecution, (3) negligence/gross negligence, and (4) civil conspiracy.

### 1.    Federal Claims

#### a.    Eleventh Amendment Immunity

Plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983. A civil action brought pursuant to 42 U.S.C. § 1983 provides a means to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States, but the statute is not, itself, a source of substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "Section 1983 imposes liability on any person who, under the color of state law, deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Doe v. Kidd*, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983).

"Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).

The Eleventh Amendment provides, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The United States Supreme Court has long held the Eleventh Amendment also precludes suits against a state by one of its own citizens. *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). This immunity extends not only to suits against a state per se, but also to suits against agents and instrumentalities of the state. *Cash v. Granville Cnty. Bd. of Ed.*, 242 F.3d 219, 222 (4th Cir. 2001).

Because Bonnette and Rawl are employed by the duly-elected Sheriff of Lexington County, Koon, all are considered arms of the state and not "persons" within the meaning of § 1983. *See Gulledge v. Smart*, 691 F. Supp. 947, 954–55 (D.S.C. 1988) (addressing whether sheriffs in South Carolina are state or county officials); *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (holding that the Greenville County Sheriff, in his official capacity, was immune from suit for monetary damages under § 1983); *Cone v. Nettles*, 417 S.E.2d 523, 524–25 (S.C. 1992) (concluding that South Carolina sheriffs and their deputies

are state officials for purposes of § 1983).

Accordingly, the undersigned recommends summary judgment be granted to Bonnette and Rawl as to Plaintiffs' § 1983 claims against them in their official capacities.[13]

            b.      Unlawful Seizure Claim Against Bonnette

"The Fourth Amendment states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized.*" *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (emphasis in original) (citing U.S. Const. amend. IV). "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996).[14]

---

[13] Plaintiffs state § 1983 claims against Bonnette and Rawl. [ECF No. 1-1 ¶ 28]. However, to the extent Plaintiffs state § 1983 claims against Koon, who is sued only in his official capacity, they are also barred by the Eleventh Amendment for the same reasons discussed above.

[14] Plaintiffs additionally state claims pursuant to the Fourteenth and Eighth Amendments. [ECF No. 1-1 ¶ 28]. However, as explained by the Fourth Circuit, the Due Process Clause of the Fourteenth Amendment is not the proper lens through which to evaluate the validity of Defendants' actions where, "[c]ompared to the more generalized notion of due process, the Fourth Amendment provides an explicit textual source of constitutional protection against [unreasonable seizures and arrests], and define[s] the 'process that is due' for seizures of persons or property in criminal cases." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (citations omitted). Additionally, Plaintiffs do not dispute, nor even address, Defendants' argument that "there is no claim that

To prove a seizure was unreasonable because it followed from a deficient warrant, a plaintiff is required to prove defendants deliberately or with a "reckless disregard for the truth" made material false statements in [her] affidavit," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), "or omitted from that affidavit 'material facts with the intent to make, or with reckless disregard of whether [she] thereby made, the affidavit misleading.'" *Miller v. Prince George's County, MD*, 475 F.3d 621, 627 (4th Cir. 2007) (citing *United States v. Coakley*, 899 F.2d 297, 300 (4th Cir. 1990)). "[I]n order to violate the Constitution, the false statements or omissions must be 'material,' that is, 'necessary to the [neutral and disinterested magistrate's] finding of probable cause." *Id.* at 628 (citing *Franks*, 438 U.S. at 155–56).

Additionally, under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Whether an officer is entitled to qualified immunity

---

can be brought pursuant to 42 U.S.C. § 1983 for an arrest without probable cause under the Eighth Amendment." [ECF No. 13-1 at 9 n.5].

is a question of law for the court and, when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. *Id.*

Carson was charged with first degree harassment. Under South Carolina law, first degree harassment:

> means a pattern of intentional, substantial, and unreasonable intrusion into the private life of a targeted person that serves no legitimate purpose and causes the person and would cause a reasonable person in his position to suffer mental or emotional distress. Harassment in the first degree may include, but is not limited to:
>
> > (1) following the targeted person as he moves from location to location;
> >
> > (2) visual or physical contact that is initiated, maintained, or repeated after a person has been provided oral or written notice that the contact is unwanted or after the victim has

filed an incident report with a law enforcement agency;

(3) surveillance of or the maintenance of a presence near the targeted person's:

> (a) residence;
> (b) place of work;
> (c) school; or
> (d) another place regularly occupied or visited by the targeted person; and

(4) vandalism and property damage.

S.C. Code Ann. § 16-3-1700(A). Here, the issue before the court "is not whether [the plaintiff] committed the offense—it is whether [the defendant] reasonably believed that [the plaintiff] was harassing . . . . [The plaintiff] must demonstrate that [the defendant's] belief that a violation occurred was not only incorrect, but was objectively unreasonable." *Hewitt v. D.P. Garrison*, C/A No. 6:12-3403-TMC, 2013 WL 6654237, at *3 (D.S.C. Dec. 17, 2013).

Turning to the evidence relied upon by Bonnette and taking facts in light most favorable to Plaintiffs, a reasonable jury could conclude that Bonnette violated Carson's Fourth Amendment rights by, "knowingly and intentionally or with reckless disregard for the truth," making false statements and omitting facts in his affidavit, rendering the affidavit misleading, and that he was objectively unreasonable in his belief that Carson harassed Raines on the night in question. *See Franks*, 438 U.S. at 155–56; *Miller*, 475 F.3d at 627; Hewitt, 2013 WL 6654237, at *3.

20

Defendants argue Bonnette had in his possession or relied upon the following in swearing his affidavit: (1) previous police reports, (2) the video evidence as provided by Raines, (3) the dispatch call made by a caller identifying himself as Carson, and Carson's statement provided thereafter, and (4) the call report and incident report created on the night in question. [ECF No. 13-8 ¶ 14, ECF No. 13-1 at 3–4, ECF No. 15 at 4 n.5–6]. The undersigned considers each in turn below.

First, Plaintiffs are correct that a review of the police reports cited by Bonnette in his affidavit and submitted to this court do not show that Carson had any interaction with Raines or Raines's family in the past except on August 25, 2017, when Raines's stepfather assaulted Carson and was thereafter arrested for the assault. [*See* ECF No. 13-13 at 22 (August 25, 2017 police report)]. Defendants do not dispute that these police reports do not name Carson, but instead argue that "Defendant Bonnette was aware of Raines making numerous complaints regarding the two vehicles being driv[en] by either Carson or [Grant]" and that "[i]n those pages of the incident report, it was not clearly identified who was driving the subject vehicles at the time." [ECF No. 15 at 7 (citing ECF No. 13-13 at 4, 7–9, 12, 16, 31)].

However, the police reports never identify Carson as driving either vehicle, nor even riding in the vehicles; instead, where a driver is identified, the reports identify only Grant. [*See, e.g.*, ECF No. 13-13 at 12 (identifying

21

Grant as driver of red Ford Explorer), *id.* at 15–16, 18 (identifying Grant as operator of red Ford Explorer), *see also id.* at 18 (referencing "Christopher Grant Smith's red Ford Explorer")]. Importantly, Bonnette conceded in his deposition these reports do not indicate "prior altercations between Carson Smith and Christopher Raines." [ECF No. 14-3 at 113:23–114:7].[15]

Without prior altercations between Carson and Raines, there is no probable cause that Carson was harassing Raines on the night in question as defined by South Carolina law. *See Smith v. Munday*, 848 F.3d 248, 254 (4th Cir. 2017) (citation omitted and emphasis added) ("An investigating officer need not exhaust[ ] every potential avenue of investigation. But an investigating officer must still conduct some sort of investigation and assemble *individualized* facts that link the suspect to the crime.").

Turning next to the video evidence, both parties argue this evidence provides definitive proof supporting their respective sides, with Plaintiffs characterizing the evidence as "exculpatory," showing "clearly that Raines approached Carson and the Gator Mart area with his bow and made what could be considered a threat . . . and, again, quickly followed Carson as he drove from the parking lot," [ECF No. 14 at 23–25], and Bonnette attesting that "[w]hile

---

[15] There appears to be some dispute as to the specific police reports Bonnette relied upon. [*See, e.g.*, ECF No. 14 at 16 n.26]. Notwithstanding, considering all police reports submitted by Defendants, none indicates prior altercations between Carson and Raines. [*See* ECF No. 13-13].

both videos had poor lighting, they both clearly showed that Raines never left his property and never pointed a crossbow at anyone." [ECF No. 13-8 ¶ 9].

However, review of the video evidence reveals nothing clearly, in that the video is almost entirely dark, with the lights of the Gator Mart shining at different distances depending on Raines' movements.[16] Based on the audio, the video indicates Raines was in possession of some type of weapon that "was cocked," although it is not clear where this weapon may have been pointed and that Raines called out, apparently to the "Smith boys," threatening phrases including "ain't you all had enough tonight," "life is better than being a gimp," and "leave us alone." [*See* ECF No. 14-13]. Taking this evidence in light most favorable to Plaintiffs, the evidence supports Plaintiffs' version of the facts in that it indicates Raines was in possession of a weapon and was threatening Grant and Carson near the Gator Mart during the relevant time period.[17] The

---

[16] The video evidence submitted to the court contains roughly an hour of mostly indiscernible visual footage, due to lack of lighting, although the audio is clear. [*See* ECF No. 14-12, ECF No. 14-17]. The undersigned does not provide a comprehensive summary of this evidence, but references it as necessary to resolve Defendants' motion for summary judgment.

[17] Defendants also argue that Carson testified in his deposition that he merely "assumed" that Raines pointed a crossbow at him. [ECF No. 13-1 at 11 n.6]. Carson did, but taken in full context, Carson also stated as follows:

> Q:   What did you – I mean, did you see AJ Blues with a bowgun
>       in his hand?
> A:   He had something for sure, yes.
> Q:   Okay. Was it a bowgun?
> A:   I believe so, yes . . . . I'm not going to say a hundred percent,
>       but I'm – . . . . It looked like a bowgun . . . .

court rejects Defendants' repeated arguments that this evidence clearly shows Raines was not in possession of a crossbow.[18]

Turning to the dispatch call and Carson's statement provided thereafter, Bonnette, in his affidavit, attests that "[i]n the recording of the 911 call, Carson advised emergency services that he believed the person chasing people around at the Gator Mart with a crossbow to be Raines" and that "when reporting the incident to Bice, both [Grant] and Carson Smith denied that Raines ever left his property in direct contravention to what was reported on the 911 call." [ECF No. 13-8 ¶¶ 3, 5, *see also* ECF No. 14-4 (Bonnette's arrest warrant affidavit stating Carson said Raines was "chasing people around in the roadway while aiming a crossbow at them," but then "recanted his statement

---

Q:    And, again, you're – you believe he was pointing a crossbow
      at you?
A:    Yes.
Q:    But you're not a hundred percent sure?
A:    From his history, he's always out there with a crossbow, I
      assumed it was a crossbow.

[ECF No. 13-4 at 14:6–17, 20:11–16].

[18] The parties appear to agree that the video was located on Raines's body, [*see* ECF No. 14-3 at 124:10–17, *see also* ECF No. 14 at 5 n.6], further undercutting Defendants' position that the video provides evidence as to what was in Raines's hands during the time in question and, if he was holding a weapon, in what direction that weapon was pointing. As stated, the video evidence is dark and appears to be originating from Raines's body, not his hands, and does not provide evidence, much less clear evidence, that there was no crossbow in Raines's possession. [*See* ECF No. 14-13]. Defendants fail to address the audio capturing Raines discussing a weapon that "was cocked."

to law enforcement after they arrived on scene and said 'the vict never left his property during the incident'")].[19]

However, review of the dispatch call reveals the caller, who identifies himself as Carson,[20] stated "[t]here is a man who is running in the middle of the road with a crossbow threatening people that drive by" [ECF No. 13-11], not that Raines was on the Gator Mart property. Additionally, taking evidence in light most favorable to Plaintiffs, Raines was located in the middle of the road that exists on Raines's property between his home and the Gator Mart, and therefore neither Carson nor Grant recanted any statement by informing Brice that Raines never left his property.[21]

---

[19] Bonnette also attests that in swearing the affidavit to secure the arrest warrant, he relied on "the video evidence [that] also revealed that Raines never left his property that evening." [ECF No. 13-8 ¶ 14]. However, because of how dark the video evidence is, this evidence does not reveal Raines's location vis-à-vis his property line. [*See also* ECF No. 14-3 at 111:8–19 (Bonnette testifying that the property line would not be apparent), *id.* at 126:11–135:11(Bonnette testifying Raines may have come within 20 to 30 yards of the Gator Mart based on review of the video evidence)].

[20] Plaintiffs have put forth evidence that although the caller identifies himself as Carson, the caller was in fact Grant. Notwithstanding, it is undisputed the caller identified himself as Carson.

[21] An aerial view of the area in question has been provided by Plaintiffs, indicating a road of some type exists on Raines's property between their home and the Gator Mart and the dentist office located behind the Gator Mart. [ECF No. 14-18]. Rawl testified there was "an easement of some type of agreement between the dentist's office" and Raines and his family, allowing use of the road by personnel of the dentist office. [ECF No. 18-1 at 25:12–25]. Grant attests, regarding the dispatch call, "[b]y road, I was referring to the dentist road not Mill Stream . . . ." [ECF No. 14-15 ¶ 3]. Therefore, as stated in the dispatch call, Raines could have been "running in the middle of the road with

Finally, Defendants point out that the call report and incident report indicate Carson informed the dispatcher that Raines was located at the Gator Mart, which would be inconsistent with statements provided by Carson and Grant after the incident in question. [*See* ECF No. 13-9 at 4, *see also* ECF No. 13-10 at 3]. However, even a cursory review of the actual dispatch call would reveal that the caller identifying himself as Carson stated "[t]here is a man who is running in the middle of the road with a crossbow threatening people that drive by." [ECF No. 13-11]. There is no other evidence except the call report and incident report indicating Carson or Grant ever stated that Raines was located at the Gator Mart. Although Defendants argue "it is clear that [Bonnette] relied on the Call Report when making the probable cause determination," [ECF No. 15 at 4], Bonnette also attests he relied on the dispatch call in making his probable cause determination, and thus would have known the call report and incident report did not accurately capture what the caller stated. [*See* ECF No. 13-8 ¶ 14, ECF No. 14-4].[22]

---

a crossbow threatening people." [ECF No. 13-11]. That Carson and Grant were reported to have later stated that Raines did not leave his property would then be consistent with what was reported in the dispatch call. [*See* ECF No. 13-9 at 4].

[22] Defendants also argue "it is clear from the Incident Report completed by Officer Bice [on the night in question] that Raines had advised law enforcement that 'he has video surveillance of the boys yelling out their windows and revving their engines," and Bonnette relied on the incident report when making his probable cause determination. [ECF No. 15 at 4 n.5 (citing ECF No. 13-9)]. However, there is no reference made to this report in Bonnette's

Here, given the totality of the circumstances, Plaintiffs have carried their burden to show that Bonnette, "when viewing all the evidence" he states he relied upon, "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Nero v. Mosby*, 890 F.3d 106, 129 (4th Cir. 2018) (citation omitted). In short, none of the sources in Bonnette's possession or relied upon by Bonnette indicates prior harassment by Carson of Raines, nor indicates that on the night in question Carson's dispatch call was made to harass Raines or that Carson provided inaccurate information.[23]

If the court "excise[s] the offending inaccuracies," the corrected affidavit

---

affidavit to secure Carson's arrest warrant. Additionally, to the extent this surveillance is different than the video evidence provided by Raines to Bonnette, which does not show Carson or Grant yelling or revving their engines, there is no indication this evidence was provided to any officer or even seen by any officer. Finally, as discussed more above, there is a genuine dispute of material fact as to whether Bonnette had reason to doubt the truthfulness of Raines's statements.

[23] Defendants argue that Bonnette "had probable cause to also charge Plaintiff Carson Smith with 'Filing of False Police Reports-S.C. Code Ann. §16-17-722' as well as 'Making a False 911 Report-S.C. Code Ann. § 23-47-80(4)' as Plaintiff Carson Smith made false statements to law enforcement and made a false report when calling 911 in an attempt to bring negative attention to Raines" and that "probable cause need only exist as to any offense that could be charged under the circumstances." [ECF No. 15 at 3, *id.* at 3 n.3 (citations omitted)]. The court rejects this argument for the same reasons as stated above. Defendants' "position that "Carson Smith made false statements to law enforcement and made a false report when calling 911" in "an attempt to bring negative attention to Raines," [ECF No. 13-1 at 14], is not supported by the record.

27

would not provide adequate grounds for arresting Carson for first degree harassment because the corrected affidavit would provide no grounds for such an arrest. *See Miller*, 475 F.3d at 628.

Defendants bring to the court's attention information provided to Bonnette by Raines and his family concerning Carson. [*See* ECF No. 15 at 5 (citing *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) ("It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker. Indeed, it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself.")]. However, as also cited by Defendants and held by this court, "a victim's statement will constitute sufficient probable cause unless there is an apparent reason for the officer to believe the victim is lying." *Williams v. Wright*, C/A No. 6:10‑2844‑TMC‑JDA, 2011 WL 6700373, at *6 (D.S.C. Nov. 2, 2011), report and recommendation adopted, C/A No. 6:10‑2844‑TMC, 2011 WL 6699448 (D.S.C. Dec. 22, 2011).

Here, the record reveals a genuine dispute of material fact as to whether Bonnette had reason to doubt the truthfulness of Raines's statements, given, as attested to by Bonnette, "the long history in which this situation had continued to fester between the two families," [ECF No. 13‑8 ¶ 8], that the video evidence reveals Raines threatening Grant and Carson, [*see* ECF No. 14‑

13], that Bonnette was aware of Raines's history of threatening RBHS students, [*see* ECF No. 14-3 at 19:19–20:8, 48:3–13], and that Bonnette knew Raines had carried a crossbow in the previous altercation with Grant and Carson that led to Dan Corley's arrest, [*see* ECF No. 14-9, ECF No. 14-3 at 56:1–3].[24]

For similar reasons, grant of qualified immunity to Bonnette at this time would be inappropriate. Based on the facts in the record and taking these facts in the light most favorable to Plaintiffs, no reasonable and prudent person would find the evidence relied upon by Bonnette established probable cause that Carson harassed Raines. *See, e.g., Robinson v. Miller*, 802 F. App'x 741, 748 (4th Cir. 2020) (denying grant of qualified immunity where no "reasonable and prudent person" would believe that the defendant engaged in a criminal activity where the videos showed defendant in close proximity to someone engaged in criminal activity "[b]ut standing alone, [] does not give rise to an objectively reasonable belief in the probable cause required to justify an arrest"); *see also Miller*, 475 F.3d at 628 (holding genuine issue of material fact existed regarding whether officer presented false statements in his warrant

---

[24] Given the recommendation above, it is unnecessary to address the parties' arguments that Bonnette also erred in "not review[ing] all the security footage from the Gator Mart or [not] wait[ing for Carson to] contact[] him back after he previously provided a witness statement" or not "going through each and every incident report related to his investigation." [*See, e.g.*, ECF No. 15 at 8, *see also, e.g.*, ECF No. 14 at 21–22, 25].

affidavit, precluding summary judgment in favor of officer on qualified immunity grounds); *Graham v. Gagnon*, 831 F.3d 176, 183 (4th Cir. 2016) ("we have repeatedly held that arrest warrants do not confer immunity if it was objectively unreasonable to conclude there was probable cause for the arrest").

Finally, the parties do not dispute that only Carson, and not Eva, can bring a claim pursuant to § 1983 against Bonnette. [*See* ECF No. 16 at 2 ("Although Mrs. Smith's constitutional rights were not violated, she does have standing in the state law causes of action")].

Accordingly, the undersigned recommends the district judge deny Defendants' motion for summary judgment as to Carson's § 1983 claim against Bonnette, in his individual capacity, for Carson's unlawful seizure.

c.    Unlawful Seizure Claim Against Rawl

To assert a viable § 1983 claim against Rawl, a causal connection or affirmative link must exist between Rawl and the constitutional violation. *See Iqbal*, 556 U.S. at 676 (providing a plaintiff in a § 1983 action must plead that the defendant, through his own individual actions, violated the Constitution); *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976) (finding a § 1983 plaintiff must show he suffered a specific injury as a result of specific conduct of a defendant, and an affirmative link between the injury and that conduct); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) ("In order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged

acted personally in the deprivation of the plaintiff's rights. The doctrine of respondeat superior has no application under this section.'") (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)); *Vinnedge*, 550 F.2d at 928 (holding for an individual to be liable under § 1983, it must be affirmatively shown the official charged acted personally in the deprivation of the plaintiff's rights).

Additionally, the doctrine of supervisory liability is generally inapplicable to § 1983 suits, such that an employer or supervisor is not liable for the acts of his employees, absent an official policy or custom that results in illegal action. *See Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Fisher v. Washington Metro. Area Transit Authority*, 690 F.2d 1133, 1142–43 (4th Cir. 1982). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official Defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see Slakan v. Porter*, 737 F.2d 368, 372–74 (4th Cir. 1984) (finding officials may be held liable for the acts of their subordinates, if the official is aware of a pervasive, unreasonable risk of harm from a specified source and fails to take corrective action as a result of deliberate indifference or tacit authorization).

Here, Plaintiffs have not shown that Rawl personally violated their constitutional rights, that there is an official policy or custom that resulted in an illegal action, nor that Rawl was deliberately indifferent to or tacitly

authorized a pervasive, unreasonable risk of harm.[25] Therefore, Rawl is entitled to summary judgment as to Plaintiffs' unlawful seizure claim.

### d.    Malicious Prosecution Claim

"A 'malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). To state a claim for malicious prosecution, "a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans*, 703 F.3d at 647.

---

[25] Although Plaintiffs argue they "provide ample argument and cite deposition testimony and other record evidence that Sgt. Rawl participated in the arrest as both supervisor and independently," [ECF No. 16 at 2], turning to Plaintiffs' recitation of the record facts, both disputed and undisputed, Plaintiffs allege only that, prior to Carson's arrest, (1) Rawl did not interview Carson, Eva, or Grant, (2) he knew Raines carried a crossbow, and (3) he had contacted Eva in roughly September 2017, advising she take steps to obtain a restraining order against Raines. [ECF No. 14 at 2–11; *see also id.* at 31 (arguing Rawl reviewed the video in part and noted no evidence of a crime, had been monitoring Raines, did not return Eva's calls)]. Although Plaintiffs discuss these allegations generally, arguing these allegations support a finding that "Rawl participated in the arrest," *id.*, Plaintiffs fail to connect these allegations to a specific claim alleging a constitutional violation or that Rawl was somehow involved in Bonnette's alleged affidavit misrepresentations or omissions. Further, as argued by Defendants and not addressed by Plaintiffs, "Rawl was not the affiant on the arrest warrant, did not sign the arrest warrant, or present it to the neutral magistrate judge." [ECF No. 13-1 at 9, ECF No. 13-3 at 32:13–34:20].

The element that criminal proceedings terminated in the plaintiff's favor "is satisfied where a prior criminal case against the plaintiff has been disposed of in a way that indicates the plaintiff's innocence." *Snider v. Seung Lee*, 584 F.3d 193, 202 (4th Cir. 2009) (Stamp, J., concurring in the judgment). Following the Restatement (Second) of Torts § 660, the South Carolina Supreme Court has held "where an accused establishes that charges were nolle prossed for reasons which imply or are consistent with innocence, an action for malicious prosecution may be maintained." *McKenney v. Jack Eckerd Co.*, 402 S.E.2d 887, 888 (S.C. 1991). Additionally, the Fourth Circuit has indicated that "the South Carolina Supreme Court would agree with other courts that have also relied on the Restatement's formulation of the rule insofar as they have imposed upon malicious prosecution plaintiffs the affirmative burden of proving that the nolle prosequi was entered under circumstances which imply or are consistent with innocence of the accused." *Nicholas v. Wal-Mart Stores, Inc.*, 33 F. App'x 61, 64–65 (4th Cir. 2002).

Here, there is no dispute that the charge of first degree harassment against Carson was nolle prossed for reasons that do not imply or are consistent with innocence. Instead, Defendants have put forth undisputed evidence that Bell dismissed the charge against Carson because there was insufficient evidence to prosecute, [ECF No. 13-18], and that, while Bell believed that there was overwhelming evidence supporting a finding of

33

probable cause to arrest Smith, the burden in proving beyond a reasonable doubt at trial would be difficult. [ECF No. 13-17 ¶ 5]. Thus, Plaintiffs have failed to carry their burden showing the proceedings were terminated in Carson's favor.[26]

In sum, the undersigned recommends denying Defendants' motion for summary judgment regarding Carson's § 1983 claim against Bonnette, in his individual capacity, for Carson's unlawful seizure, but otherwise granting Defendants' motion as to all other § 1983 claims brought by Plaintiffs.

    2.    State-Law Claims

Plaintiff's state-law claims are brought pursuant to the South Carolina Tort Claims Act ("SCTCA"). The SCTCA is "the exclusive remedy for any tort committed by an employee of a governmental entity" acting within the scope of their employment. S.C. Code Ann. § 15-78-70(a). "The State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like

---

[26] To the extent Plaintiffs rely on Eva's conversation with "Lt. Frier of the Sheriff's Department" who stated "he did not agree with the charges against my sons and never heard Mr. Raines mention Carson's name," [ECF No. 14-2 ¶ 22], as evidence that Carson's proceedings were terminated in his favor, the court rejects this argument. Such evidence does address why Carson was nolle prossed. *See Salley v. Myers*, C/A 3:17-3425-JFA-PJG, 2019 WL 1075071, at *6 (D.S.C. Mar. 6, 2019) ("Plaintiff has failed to point this Court to any evidence contradicting Defendant's claim that the charge was nolle prossed because Defendant wanted to cut Plaintiff a break.").

circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained" within the SCTCA. S.C. Code Ann. § 15-78-40. However, the SCTCA additionally provides a "governmental entity is not liable for the loss resulting from . . . employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-60 (17); *see also id.* at § 15-78-70(b). Finally, claims brought pursuant to the SCTCA against an employee acting within the scope of his official duties must be brought against the agency or political subdivision for which the employee was acting at the time. *See* S.C. Code Ann. § 15-78-70(c).

Before proceeding to Plaintiffs' state-law claims, the undersigned addresses the issue of identifying the proper parties for Plaintiffs' SCTCA claims. First, Defendants argue (1) Bonnette and Rawl are not proper parties for any state law claims pursuant to the SCTCA and that "[t]he Complaint does not allege nor is there any evidence that Defendants Bonnette and Rawl were acting outside the course and scope of their employment," (2) "[t]here is no entity known as the Lexington County Sheriff's Department under the laws of South Carolina," and (3) "under the laws of the State of South Carolina, including the State Constitution, . . . the Sheriff of Lexington County is the proper legal entity subject and amenable to suit for any state law claims." [ECF

35

No. 13-1 at 21–22, 33 n.16].

Plaintiffs fail to respond to these arguments. [*See* ECF No. 14, ECF No. 16].[27] Because Defendants have put forth evidence that the Sheriff of Lexington County is the proper defendant for Plaintiffs' state-law claims, *see* S.C. Code Ann. § 15-78-70(c), and because Plaintiffs have failed to dispute this evidence or even address these arguments, the undersigned recommends dismissal of all state-law claims against all Defendants except Koon.[28]

Defendants additionally argue that Eva "is an improper party for any state law claims" brought pursuant to the SCTCA, arguing that Eva has failed to establish a "loss" as defined under the act. [ECF No. 13-1 at 33–35 (citing S.C. Code Ann. § 15-78-30(f) (defining "loss" as "bodily injury, disease, death, or damage to tangible property, including lost wages and economic loss to the person who suffered the injury, disease, or death, pain and suffering, mental

---

[27] Plaintiffs do not allege, [*see* ECF No. 1-1], and neither party addresses whether Bonnette or Rawl engaged in conduct "which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-60 (17).

[28] Defendants further argue that Lexington County is not a proper defendant and should be dismissed. [ECF No. 13-1 at 32–33]. Defendants "recognize that 'Lexington County' has not been listed as a named defendant on PACER. Out of an abundance of caution, since 'Lexington County' is clearly listed as a defendant based upon the caption of the Complaint, Defendants have also addressed any claims that may pertain to 'Lexington County.'" [ECF No. 15 at 1 n.1]. Plaintiff does not address this argument. [*See* ECF No. 14, ECF No. 16]. Accordingly, the undersigned recommends dismissal of Lexington County to the extent Lexington County is a defendant in this action.

anguish, and any other element of actual damages recoverable in actions for negligence, but does not include the intentional infliction of emotional harm."). Plaintiffs respond, albeit not until their surreply brief, that Eva "forwarded the funds for bond, attorneys fees and other items due to the arrest as Carson was a dependent minor," asserting Eva therefore "has standing in the state law causes of action." [ECF No. 16 at 2].[29]

The Supreme Court of South Carolina has held that a parent may recover expenses paid on behalf of a minor child under the SCTCA's definition of "loss," and the parent's claim based on that loss is separately cognizable from the minor child's claim. *See, e.g. Wright v. Colleton Cty. Sch. Dist.*, 391 S.E.2d 564, 569 (S.C. 1990) ("the parent is a 'person' who has a 'claim or action' if she has suffered a 'loss.' We have already determined that the parent's claim for medical expenses and loss of services of the son is a 'loss' within the definition of Section 15–78–30(f). We find that the parent's loss is a loss which is separately cognizable under the Tort Claims Act . . . ."). Therefore, the court rejects Defendants' argument that Eva is not a proper party to Plaintiffs'

---

[29] Defendants argue that Plaintiffs waived this argument by not addressing it in their opposition to Defendants' motion for summary judgment. [ECF No. 15 at 1–2]. However, the court "possesses the discretion under appropriate circumstances to disregard the parties' inattention to a particular argument or issue." *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013). Here, the record reveals, and Defendants cite in their motion for summary judgment, evidence that Eva "paid for Plaintiff Carson Smith's legal fees, his ankle monitor fees" in their motion for summary judgment. [ECF No. 13-1 at 34].

SCTCA claims for failure to establish "loss" under the SCTCA.[30]

### a.     Malicious Prosecution

"[T]o maintain an action for malicious prosecution [under South Carolina law], a plaintiff must establish: (1) the institution or continuation of original judicial proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in [the] plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage." *Pallares v. Seinar*, 756 S.E. 2d 128, 131 (S.C. 2014). As stated above, the record shows that the charge of first degree harassment against Carson was nolle prossed for reasons that do not imply or are consistent with innocence. *See McKenney*, 402 S.E.2d at 888. Therefore, Plaintiffs' claim for malicious prosecution brought under South Carolina law fails, and the undersigned recommends the district judge grant Defendants' motion for summary judgment as to this claim.[31]

---

[30] Because Plaintiffs only address this issue in their surreply, Defendants have requested they be "afforded a reasonable opportunity to reply to those newly raised arguments and/or testimony." [ECF No. 17 at 6]. As stated, Defendants themselves cited to the evidence noted by Plaintiffs regarding Eva's "loss" under the SCTCA. However, to the extent such an opportunity to respond should be afforded, Defendants can address this issue in their objections to this report.

[31] Given the recommendation above, it is unnecessary to address the parties' arguments as to whether governmental entities are immune from suit for claims of malicious prosecution under the SCTCA or whether Plaintiffs can establish the malice element. [*See, e.g.*, ECF No. 13-1 at 23–26].

b.    False Arrest

Under South Carolina law, to prevail on a claim for false arrest or imprisonment, a plaintiff must prove both that he was deprived of his liberty and that the deprivation was done without lawful justification. *Jones v. City of Columbia*, 389 S.E.2d 662, 663 (S.C. 1990). Stated differently, a plaintiff must show that "(1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful." *Law v. S.C. Dep't of Corrs.*, 629 S.E.2d 642, 651 (S.C. 2006).

Here, Carson was arrested pursuant to a facially-valid warrant. South Carolina law has long recognized that "where one is properly arrested by lawful authority an action for false imprisonment cannot be maintained against the party causing the arrest." *Bushardt v. United Inv. Co.*, 113 S.E. 637 (S.C. 1922); *see also Dorn v. Town of Prosperity*, 375 Fed. Appx. 284, 288 (4th Cir. 2010) (recognizing "the long-standing precedent in South Carolina that there can be no claim for false arrest where the arrest is effectuated pursuant to a facially valid warrant").

As the South Carolina Court of Appeals has recently ruled, "[i]t has long been the law that one arrested pursuant to a facially valid warrant has no cause of action for false arrest." *Carter v. Bryant*, 838 S.E.2d 523, 528 (S.C. Ct. App. 2020) (citation omitted). In the event no probable cause existed, the remedy is to sue for malicious prosecution, not false arrest. *Id.* (citing *Brooks*,

39

85 F.3d at 181) ("At common law, allegations that a warrantless arrest or imprisonment was not supported by probable cause advanced a claim of false arrest or imprisonment . . . . However, allegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued, are analogous to the common-law tort of malicious prosecution.").[32]

As further explained in *Carter*:

> The facially valid inquiry is not an invitation to look beyond the language of the warrant, which need only contain information given under oath that "plainly and substantially" sets forth the offense charged. S.C. Code Ann. § 22-3-710 (2007). We conclude as a matter of law that the warrant here was facially valid and complied with section 22-3-710 as it set forth concrete facts plainly and substantially showing Carter had committed the crime. Deputy Gwinn's affidavit was sworn under oath, and the

---

[32] Plaintiffs rely on *Jackson v. Sheriff of Lexington County and Wiseman*, 2016-CP-32-01432, for the proposition that their claim for false arrest or imprisonment is not barred. [*See* ECF No. 14 at 33 ("In fact, in very similar facts to these against another deputy of Lexington County, who was alleged to have provided false information in a warrant, State Circuit Court allowed the jury to consider the false arrest claim among other claims and the jury found in favor of the woman arrested based on the false arrest cause of action.); ECF No. 14-29 (*Jackson* verdict form and complaint)]. However, Plaintiffs do not dispute that *Jackson* is inconsistent with long-standing South Carolina precedent and that the jury verdict in *Jackson* was rendered before *Carter*, discussed above. *See also Dorn*, 375 F. App'x at 288 ("The decision did not discuss, nor could the Court of Appeals overrule, the long-standing precedent in South Carolina that there can be no claim for false arrest where the arrest is effectuated pursuant to a facially valid warrant."). Although Plaintiffs indicate *Carter*'s holdings may be altered on appeal, [ECF No. 14 at 33 n.49], Defendants have put forth evidence that counsel for the plaintiff in *Carter* has petitioned for writ of certiorari, but only regarding the court of appeals' reversal of the jury's malicious prosecution verdict. [ECF No. 15-4].

> magistrate signed the warrant attesting that the affidavit furnished "reasonable grounds to believe" Carter committed the crime . . . . A warrant is "facially valid" if (1) it is regular in form, (2) it is issued by a court official having authority to issue the warrant for the conduct it describes and jurisdiction over the person charged, and (3) all proceedings required for the proper issuance of the warrant have duly taken place. *See* Restatement (Second) of Torts § 123 (Am. Law Inst. 2019).

*Id.* at 529.

Plaintiffs argue that because Bonnette provided identical affidavits for two persons and alleged facts for each that could have only been taken by one individual, because the warrant contains "facially incorrect" evidence regarding Carson related to the police reports, and because the warrant does not allege Raines was harmed, a requirement to prove harassment, the warrant is invalid. [ECF No. 14 at 33–34]. The court rejects the invitation to "look beyond the language of the warrant," and Plaintiffs provide no case law, nor is the court aware of any, indicating these challenges are facial challenges nor that these challenges indicate that the warrant at issue did not "plainly and substantially sets forth the offense charged." *See Carter*, 838 S.E.2d at 529.

Accordingly, the undersigned recommends the district judge grant Defendants' motion for summary judgment as to this claim.

c.    Negligence/Gross Negligence

To maintain an action for negligence, "a plaintiff must show: (1) the

41

defendant owes a duty of care to the plaintiff; (2) the defendant breached that duty by a negligent act or omission; (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury; and (4) the plaintiff suffered an injury or damages." *Roddey v. Wal-Mart Stores E., LP*, 784 S.E.2d 670, 675 (S.C. 2016) (citation omitted). "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Etheredge v. Richland Sch. Dist. One*, 534 S.E.2d 275, 277 (S.C. 2000) (citation omitted). It is the failure to exercise even "slight care." *Id.*

Defendants argue Plaintiffs' negligence-based claim fails because South Carolina does not recognize a cause of action for negligent investigation or negligent arrest. [ECF No. 13-1 at 29–30 (citing *Wyatt v. Fowler*, 484 S.E.2d 590 (S.C. 1997) (applying public duty rule to preclude negligence claims against a sheriff and his deputies for acts taken while attempting to execute an arrest warrant))].

However, "South Carolina courts have determined the public duty rule only comes into play when, 'and only when, the plaintiff relies upon a statute as creating the duty.'" *Murphy v. Fields*, C/A No. 3:17-2914-CMC, 2019 WL 5417735, at *7 (D.S.C. Oct. 23, 2019) (citing *Arthurs ex rel. Estate of Munn v. Aiken County*, 551 S.E.2d 579, 582 (S.C. 2001)). Here, because Plaintiffs "[do] not assert negligence based on breach of a statutory duty, [Defendants']

42

argument based on the public duty rule is inapposite to [their] negligence claim." *Newkirk v. Enzor*, 240 F. Supp. 3d 426, 437 (D.S.C. 2017).

As held by this court, under the common law duty of care, officers have a "duty to act reasonably in [their] interactions." *Murphy*, 2019 WL 5417735, at *8 (denying defendant Richland County Sheriff's Office's motion for summary judgment as to claims for negligence and gross negligence based on officer's actions in effecting plaintiff's arrest); *see also Crowley v. Spivey*, 329 S.E. 2d 774, 780 (S.C. 1985) ("One who assumes to act, even though under no obligation to do so, may become subject to the duty to act with due care."); *Newkirk*, 240 F. Supp. 3d at 437–38 (citations omitted) ("Specifically, [the officer] owed [the plaintiff] the duty to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation," when the officer effected a roadside traffic stop on plaintiff); *Brown v. Brown*, 598 S.E.2d 728, 731 (S.C. Ct. App. 2004) (finding the public duty rule did not bar the plaintiff's negligence claims against police officers for decisions the officers made during a traffic stop).[33]

---

[33] Additionally, the undersigned rejects Defendants' argument that "it is well settled under South Carolina law that intentional torts 'cannot be committed in a negligent manner.'" [ECF No. 13-1 at 30 (citing *State Farm Fire and Cas. Co. v. Barrett*, 530 S.E.2d 132, 137 (S.C. 2000))]. Although Defendants appear to argue otherwise, *see id.*, an investigation or arrest can be conducted in a negligent manner. *See, e.g., Murphy*, 2019 WL 5417735, at *8 (denying defendants' motion as to "Plaintiff's First Cause of Action against the RCSD for negligence and gross negligence as to the manner of Plaintiff's arrest by

3:19-cv-02155-JMC    Date Filed 08/03/20    Entry Number 22    Page 44 of 49

In response, Plaintiffs do not directly address Defendants' argument or case law [*see* ECF No. 14, ECF No. 16], but instead state inconclusively that they "may likely need to prove gross negligence rather than simple negligence," additionally arguing as follows:

> In this matter, there is substantial evidence that Bonnette and Rawl did not exercise even slight care in reviewing the evidence alleged against Carson, including but not limited to, the incident reports and the video. Further, neither officer took any steps to investigate the issues they apparently deemed important to the arrest and they failed to consider the evidence that Raines was seeking to harm Carson after the arrest of his step father and before the events of October 6. Defendants had a duty to do their job and did not exercise slight care in taking affirmative acts and in their omissions in providing exculpatory evidence. Defendants breached the duty of care applicable and such breach proximately caused Plaintiffs damages.

[ECF No. 14 at 34–35].[34]

Taking evidence in the light most favorable to Plaintiffs and because the undersigned rejects Defendants' arguments that Plaintiffs cannot bring a

---

Fields and the Fifth Cause of Action against Fields for excessive force under 42 U.S.C. § 1983," also pertaining to the arrest).

[34] Somewhat unclearly, Plaintiffs state that "Defendants claim that the governmental entities in this matter are immune because on exceptions to the tort claims act" but that "[i]mmunity through the tort claims act is not applicable to operational decisions and the determination of probable cause, making an arrest and other similar acts are not the type of discretionary act contemplated in tort claims act." [ECF No. 14 at 34]. In support, Plaintiffs cite *Clark v. S.C. Dep't of Pub. Safety*, 578 S.E.2d 16 (S.C. Ct. App. 2002), where the officer who conducted the high speed chase had a duty to the deceased derived from statutory authority not at issue here, and where the court held the officer was not immune under absolute discretionary immunity pursuant to S.C. Code Ann. § 15-78-60(5), an immunity not invoked by Defendants here.

negligence-based claim, the undersigned recommends the district judge deny Defendants' motion as to this claim.

### d.    Civil Conspiracy

"A civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff." *McMillan v. Oconee Mem'l Hosp., Inc.*, 626 S.E.2d 884, 886 (S.C. 2006); *see also Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607, 611 (S.C. 1981) ("Conspiracy is the conspiring or combining together to do an unlawful act to the detriment of another or the doing of a lawful act in an unlawful way to the detriment of another."); *Vaught v. Waites*, 387 S.E.2d 91, 95 (S.C. Ct. App. 1989) ("Civil conspiracy consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage."). The gravamen of the tort of civil conspiracy is the damage resulting to the plaintiff from an overt act done pursuant to a common design. *Vaught*, 387 S.E.2d at 95.

Plaintiffs argue that "Bonnette, with Rawl pointing the way, there is substantial evidence that the two combined to provide the magistrate with false information and evidence allowing a probable cause determination and the resulting incarceration." [ECF No. 14 at 35]. However, Plaintiffs cite to no record evidence, nor is the court aware of any, supporting this assertion.

Additionally, Defendants argue Plaintiffs' civil conspiracy claim must

fail because, pursuant to the intracorporate conspiracy doctrine, an employer cannot conspire with itself. *See McLain v. Pactiv Corp.*, 602 S.E.2d 87, 90 (S.C. App. 2004) (a corporation cannot conspire with itself and the acts of agents of the corporation are the acts of the corporation). State and federal courts have considered the doctrine when defendants are governmental agencies and their employees. *See e.g., Anthony v. Ward*, 336 F. App'x. 311 (4th Cir. 2009); *Pridgen v. Ward*, 705 S.E.2d 58 (S.C. Ct. App. 2010).

In considering the application of the intracorporate conspiracy doctrine, the undersigned notes courts have found the doctrine does not apply when individual defendants acted outside of their official capacities as employees. *McMillan*, 626 S.E.2d at 887. However, because Plaintiff has failed to allege or provide evidence that Rawl or Bonnette acted outside the scope of their employment, the intracorporate conspiracy doctrine applies. *Id.* ("[W]e believe that it is well settled that a corporation cannot conspire with itself. *See* 16 Am.Jur.2d Conspiracy § 56 (2005) (stating that a corporation cannot be a party to a conspiracy consisting of the corporation and the persons engaged in the management, direction, and control of the corporate affairs, where the individuals are acting only for the corporation and not for any personal purpose of their own).").[35]

---

[35] Plaintiffs acknowledge a legal entity cannot conspire with itself, but argue that "two or more of its agents can." [ECF No. 14 at 35 (citing *Lee v.*

Therefore, the undersigned recommends the district judge grant Defendants' motion for summary judgment as to this claim.[36]

### 3.    Remaining Motions

Defendants have filed a motion to strike Plaintiffs' surreply, noting Plaintiffs failed to seek leave of the court to so file, and, "[i]n the alternative . . . Defendants assert they should be afforded a reasonable opportunity to reply to those newly raised arguments and/or testimony." [ECF No. 17 at 6, ECF No. 21 at 1–2].

Under the Local Civil Rules, "sur-replies [are] even more discouraged" than replies, and "are also typically unnecessary." *Burris v. Ware*, C/A No. 2:13-0699-RBH, 2014 WL 3054612, at *3 (D.S.C. July 3, 2014). Notwithstanding, a review of Plaintiffs' surreply reveals this brief provides limited dispositive argument or evidence not previously addressed by Defendants in briefing, or discussed by the court above, but also clarifies

---

*Chersterfield Gen. Hosp., Inc.* 344 S.E.2d 379, 383 (S.C. Ct. App. 1986))]. However, that argument does not take into account that when employees are acting within the course and scope of their employment, they cannot conspire amongst themselves. *See Cricket Cove Ventures, LLC v. Gilland*, 701 S.E.2d 39, 46 (S.C. Ct. App. 2010). Because Plaintiffs alleged in their complaint that Bonnette and Rawl were at all times acting within the course and scope of their official duties as law enforcement officers employed by the Sheriff of Lexington County, Plaintiffs' argument fails.

[36] Given the recommendation above, it is unnecessary to address Defendants' arguments that Plaintiffs' claim for conspiracy fails because Plaintiffs failed to specifically state any special damages and did nothing more than refer to previous allegations to support this cause of action. [ECF No. 13-1 at 31–32].

Plaintiffs' stance on certain issues regarding Defendants' motion for summary judgment. Therefore, the undersigned denies Defendants' motion to strike and alternative request to submit an additional brief.

Additionally, Plaintiffs have filed a motion to amend their opposition to Defendants' motion for summary judgment, [ECF No. 18], in order to replace the document found at ECF No. 14-20 with the correct document found at ECF No. 18-1. Defendants do not object to Plaintiffs' request. [ECF No. 19]. The undersigned grants Plaintiffs' motion.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned denies Defendants' motion to strike [ECF No. 17] and grants Plaintiffs' motion to amend [ECF No. 18], and recommends the district judge grant in part and deny in part Defendants' motion for summary judgment, dismissing all claims except (1) Carson's § 1983 claim against Bonnette, in his individual capacity, for unlawful seizure and (2) Plaintiffs' negligence/gross negligence claim against Koon. [ECF No. 13].

IT IS SO RECOMMENDED.

August 3, 2020                                Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).